IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
October 26, 2006 Session

JOHNNIE MAE HALL AND THERESA DIANE JONES, CO-
ADMINISTRATORS FOR THE ESTATE OF BILLY WAYNE JONES,
DECEASED v. ANDREW STEWART, ET AL.

Direct Appeal from the Circuit Court for Shelby County
No. CT-003923-01     Kay S. Robilio, Judge

_____

No. W2005-02948-COA-R3-CV - Filed January 31, 2007

_____

This is a wrongful death case.  On appeal, Ms. Theresa Diane Jones (Ms. Jones) and Ms. Johnnie
Mae Hall (Ms. Hall) contend that two erroneous admissions of evidence unfairly influenced the
jury's award of damages for the wrongful death of Mr. Billy Wayne Jones (Mr. Jones).  The jury
found that Mr. Jones suffered damages in the amount of $100,000 but also found that he was 49%
at fault.  The jury's verdict resulted in a net recovery of $51,000.  Ms. Jones and Ms. Hall request
a new trial of the action they instituted against Fullen Dock & Warehouse, Inc. (Fullen Dock), whose
employee ran over Mr. Jones with a bulldozer, resulting in his death.  Specifically, Ms. Jones and
Ms. Hall argue that the trial judge abused her discretion in admitting evidence of Mr. Jones's prior
medical history during the cross-examination of their own medical expert and of Mr. Jones's prior
guilty plea and conviction for cocaine possession six years prior to his death.  Finding no abuse of
discretion, we affirm.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; and
Remanded

DAVID R. FARMER, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S.,
and ALAN E. HIGHERS, J., joined.

Gary R. Wilkinson and Russell C. Rutledge, Germantown, Tennessee and Christopher M. Norem,
Chicago, Illinois, for the appellants, Johnnie Mae Hall and Theresa Diane Jones, Co-Administrators
of the Estate of Billy Wayne Jones, Deceased.

J. Kimbrough Johnson, Kyle M. Wiggins and Kevin O'Neal Baskette, Memphis, Tennessee, for the
appellees, Andrew Stewart and Fullen Dock & Warehouse, Inc.

**OPINION**

The dispute in this appeal involves two admissions of evidence the appellants contend unfairly influenced the jury's award in the instant action for wrongful death. In this case, Mr. Billy Wayne Jones (Mr. Jones) was killed when a bulldozer ran over him. At the time of the incident, Mr. Jones worked at a landfill as a "spotter," directing dump trucks to the appropriate location for depositing the waste they were hauling. On the day in question, the bulldozer driver, Mr. Andrew Stewart (Mr. Stewart), was spreading and leveling large piles of trash and debris recently dumped there. Mr. Stewart testified that he had spoken with Mr. Jones that morning, but that Mr. Jones had walked off to another area after their conversation. Approximately twenty to twenty–five minutes after their conversation, Mr. Stewart saw Mr. Jones's body beside the bulldozer. Mr. Jones was not wearing an orange safety vest that Fullen Dock asserted had been provided to him. There were no witnesses to this tragic incident.

As co-administrators of Mr. Jones's estate, Ms. Theresa Diane Jones, the adult daughter of Mr. Jones, and Ms. Johnnie Mae Hall, the girlfriend of Mr. Jones, filed a wrongful death suit against Andrew Stewart[1] and Fullen Dock & Warehouse, Inc. (Fullen Dock) for ten million dollars ($10,000,000) on June 27, 2001. The complaint sought compensatory damages for pain and suffering, medical expenses, burial expenses, the pecuniary value of Mr. Jones's life, loss of enjoyment of life, and loss of income and earning capacity. The jury trial commenced on August 29, 2005, and concluded on September 8, 2005. Finding Fullen Dock liable for the wrongful death of Mr. Jones, the jury awarded $100,000 to the plaintiffs, which was reduced to $51,000 in light of the additional finding that Mr. Jones was 49% at fault. The court entered judgment on the jury verdict on September 21, 2005.

The plaintiffs moved the court for a new trial pursuant to Rule 59.02 of the Tennessee Rules of Civil Procedure. At the least, the plaintiffs argued, the trial court should grant a new trial only on the issue of damages in light of two erroneous admissions of evidence. Ms. Jones and Ms. Hall contended that the admissions into evidence of Mr. Jones' prior medical history and prior guilty plea for possession of cocaine reduced the award by lowering the total amount of damages, by lowering Fullen Dock's liability, or by doing both. On November 18, 2005, the court denied the motion for a new trial and affirmed the judgment entered on the jury verdict. Ms. Jones and Ms. Hall filed a timely notice of appeal and now renew their request for a new trial in light of these purported erroneous evidentiary rulings.

**Issues Presented**

Ms. Hall and Ms. Jones raise the following issues, as restated, on appeal:

---

[1]On the motion of Ms. Jones and Ms. Hall, the trial court dismissed the claims against Andrew Stewart, the driver of the bulldozer, without prejudice.

1.     Whether the trial court erred in admitting evidence of the decedent's past
       medical history without proper expert testimony; and

2.     Whether the trial court erred in admitting evidence of the decedent's guilty
       plea to possession of cocaine.

## Standard of Review

This Court  reviews a trial court's evidentiary rulings according to an abuse of discretion standard. *Fletcher v. Bickford*, No. E2000-01020-COA-R3-CV, 2001 WL 12224, at *8 (Tenn. Ct. App. Jan. 5, 2001)(*no perm. app. filed*)(citing *Otis v. Cambridge Mut. Fire Ins. Co.,* 850 S.W.2d 439, 442 (Tenn. 1992)).  We afford a wide degree of latitude to a trial court's decision to admit or exclude evidence, as such rulings are within its sound discretion. *Id.*  Abuse of discretion involves, first,  a trial court's application of an incorrect legal standard or arrival at a decision contrary to logic or reasoning. *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 131 (Tenn. 2004).  Then, such an error will rise to the level of abuse of discretion when it works an injustice on the party complaining of it. *Id.*   Even when our review reveals error, we will not set aside a final judgment unless, in light of the whole record, the "error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b).

## Analysis

### The Jury's General Verdict and the Standard for Wrongful Death Damages in Tennessee

It is impossible to determine the relevance or admissibility of evidence without understanding the purpose for which the evidence has been offered.  Moreover, in reviewing whether these alleged evidentiary errors justify vacating the judgment and ordering a new trial, we must consider the trial court's rulings and the jury's verdict in light of our state's provisions governing the parameters of wrongful death damages.

The Tennessee statute governing wrongful death actions identifies two classifications of damages recoverable in wrongful death actions. *Thrailkill v. Patterson*, 879 S.W.2d 836 (Tenn. 1994).  Tennessee Code Annotated Section 20-5-113 allows for the

> right to recover for the mental and physical suffering, loss of time, and necessary
> expenses resulting to the deceased from the personal injuries, and also the
> damages resulting to the parties for whose use and benefit the right of action
> survives from the death consequent upon the injuries received.

Tenn. Code Ann. § 20-5-113 (1994 & Supp. 2006).  The first category of damages stems from injury sustained by the decedent between the time of injury and death. *Jordan v. Baptist Three Rivers Hosp.*, 984 S.W.2d 593, 600 (Tenn. 1999).  This category encompasses medical expenses,

funeral expenses, physical and mental pain and suffering, lost wages, and loss of earning capacity. *See id.* Recovery for pain and suffering requires proof of conscious injury. *Knowles v. State*, 49 S.W.3d 330, 338 (Tenn. Ct. App. 2001)(citing *Hutton v. City of Savannah*, 968 S.W.2d 808, 811 (Tenn. Ct. App. 1997)). Moreover, hedonic damages, or compensation for the loss of enjoyment of life, are not recoverable under Tennessee's wrongful death statutes. *See Jordan*, 984 S.W.2d at 595 n.2; *Spencer v. A-1 Crane Serv., Inc.*, 880 S.W.2d 938, 943 (Tenn. 1994).

The second category, considered "incidental damages," arises from injury sustained by the decedent's spouse or next of kin and includes the pecuniary value of the decedent's life. *Jordan*, 984 S.W.2d at 600; *Spencer v. A-1 Crane Serv., Inc.*, 880 S.W.2d 938, 943 (Tenn. 1994). In determining the pecuniary value of the decedent's life, the trier of fact must consider factors such as the decedent's expectancy of life; age; condition of health; capacity for earning money through a skill, art, trade, profession, occupation, or business; and personal habits regarding sobriety and industry. *Jordan v. Baptist Three Rivers Hosp.*, 984 S.W.2d 593, 600 (Tenn. 1999). The decedent's probable living expenses are then deducted from the incidental damages. *Id.*

Pecuniary value also includes spousal and parental consortium. *Id.* at 601. Consortium encompasses the tangible services provided to the family by the decedent as well as the intangible benefits received by the family members, such as attention, care, guidance, protection, affection, companionship, love, and training. *Id.* at 602. In the case of an adult child's claim for loss of parental consortium, the fact finder must consider factors such as the closeness of the relationship between the child and the decedent, as well as the child's dependence on the decedent (i.e., for assistance provided to handicapped or special needs adult child or for assistance with day care). *Id.* In these cases, although the child's age, in and of itself, does not determine whether parental consortium damages are appropriate, an adult child's relationship with the decedent parent might be too attenuated to sustain a case for loss of consortium or to support more than nominal damages. *See id.*

The record reveals that the only basis for recovery was Ms. Jones's claim for loss of parental consortium. There was no evidence to support an award for damages sustained by Mr. Jones himself. Plaintiffs offered no evidence of medical expenses or burial expenses, nor could they have claimed lost wages or income, because Mr. Jones died instantly. Further, plaintiffs could not establish a case for pain and suffering due to the testimony of their medical expert, Dr. Kenneth Snell (Dr. Snell), who testified that Mr. Jones died instantly as a result of the blunt force injuries and that, in such a case, the decedent would feel no pain after the impact.

Moreover, regarding incidental damages, Ms. Jones and Ms. Hall offered no evidence pertaining to the loss of Mr. Jones's future income and, although Mr. Jones was approved for disability payments shortly after his death, failed to produce any values as to expected Social Security or disability payments. Because incidental damages are measured by the loss sustained

solely by Ms. Jones,[2] only the pecuniary value of Mr. Jones's life as related to his daughter can support an award for this second category of damages. Plaintiffs offered minimal proof as to Mr. Jones's tangible services rendered to his daughter.[3] The only remaining basis for recovery could be Ms. Jones's loss of intangible benefits she would have received from her father. Counsel for Ms. Jones and Ms. Hall conceded this fact during a bench conference when he stated, "[the conviction] is irrelevant to the issue of damages in this case. The damages are this man's relationship with his daughter, period."

Now turning to the parties' particular arguments, we are mindful of the general factors relevant to wrongful death damages: the decedent's expectancy of life; age; condition of health; capacity for earning money through a skill, art, trade, profession, occupation, or business; and personal habits regarding sobriety and industry; as well as the closeness of the relationship between the adult child and the decedent and the child's dependence on the decedent (i.e., for assistance provided to handicapped or special needs adult child or for assistance with day care). We review the evidentiary rulings in light of these factors; however, in determining whether an erroneous ruling has prejudiced Ms. Jones and Ms. Hall, we must account for the fact that the sole basis for the award was Ms. Jones's (an adult child's) claim for loss of parental consortium.[4]

### *Admission of Evidence Relating to Mr. Jones's Prior Medical History*

First, Ms. Jones and Ms. Hall challenge the admission of Mr. Jones's prior medical history into evidence during the cross-examination of their own medical expert. Counsel for Ms. Jones and Ms. Hall called Dr. Kenneth Snell, Deputy Chief Medical Examiner of Shelby County, to review a report based upon an external examination of Mr. Jones's body and identify the cause of death to be multiple blunt force injuries.

Dr. Snell received his medical degree, completed an internship in internal medicine, and also attended a general pathology training program at the University of South Alabama. The completion of a fellowship in forensic pathology in Chapel Hill, North Carolina, concluded Dr. Snell's ten years of training and education. At the time of trial, Dr. Snell had practiced for four years, the first two as a medical examiner in Charlotte, North Carolina, and the balance at the

---

[2]Tennessee's wrongful death statutes provide that the cause of action for wrongful death passes to the decedent's child or children where there is no surviving spouse. Tenn. Code Ann. § 20-5-106(a) (1994 & Supp. 2006). Damages sustained by the one to whom the cause of action passes are recoverable as incidental damages. *See* Tenn. Code Ann. § 20-5-113 (1994 & Supp. 2006).

[3]At the time of trial, Ms. Jones lived in Chicago with her children. Although Ms. Jones's children spent summers in Tennessee, they resided with their grandmother, not with Mr. Jones. Moreover, Mr. Jones's brother testified to the decedent's involvement with his grandchildren during the summers, but Ms. Jones herself, when asked how the summer stays affected her, testified only to the fact that she missed her children, not to the value of the childcare rendered by her family members.

[4]Because Fullen Dock has not questioned whether there is sufficient evidence to sustain Ms. Jones's recovery of parental consortium damages, we will not address that issue here.

Shelby County Regional Forensic Center as Deputy Chief Medical Examiner. In addition to discussing his publications and teaching experience, he testified to his board certification in anatomic pathology, clinical pathology, and forensic pathology. A practicing forensic pathologist, Dr. Snell specialized in the investigation of nonnatural deaths. Dr. Snell's training and board certifications, however, encompassed the general field of pathology, which he defined as including "the investigation . . . [of] tissues that are removed from the body, or fluids that are removed from the body, looking for disease processes." A general pathology process, according to Dr. Snell, includes heart disease, diabetes, stroke, and cancer.

On cross-examination, counsel for Fullen Dock presented to Dr. Snell some of Mr. Jones's prior medical records from the Regional Medical Center. Counsel for Ms. Jones and Ms. Hall had filed a motion in limine to exclude this evidence, but the motion was denied. The first record, dated April 12, 2000, revealed a diagnosis of diabetes. Dr. Snell gave a brief summary of the types of diabetes and stated that either type can cause death. Counsel then asked Dr. Snell how diabetes would affect life expectancy in general. When counsel for Ms. Jones and Ms. Hall then objected to Dr. Snell's qualifications to testify as to life expectancy, the trial judge instructed counsel for Fullen Dock to lay a foundation. Dr. Snell then testified to completing ten years of training from medical school through his fellowship, to his study of diabetes, and to his familiarity with diabetes and its effect on the human body. Dr. Snell stated that even with proper treatment, diabetes would shorten one's life expectancy, but that without proper treatment, there would be a "definite shortening." Yet another record of the same date revealed that Mr. Jones had a history of blacking out. Plaintiff's counsel again objected on the grounds of irrelevance and asserted that opposing counsel was merely attempting to show that Mr. Jones blacked out on the day of the incident. During the bench conference, the trial judge indicated that, as she had previously ruled, the medical records were admissible to show "what kind of condition [Mr. Jones] was in" and then further commented that they were admissible as circumstantial evidence that Mr. Jones passed out on the day in question.

Dr. Snell continued to review records from the Medical Regional Center and conveyed their contents, at times explaining the medical terminology. The records included information such as Mr. Jones's history of blackouts and recurring dizziness since December of 1999; of vertigo and ataxia, or difficulty with walking; of blacking out once while driving and losing consciousness for ten minutes, which resulted in the loss of his job; of medications for diabetes, high blood pressure, and dizziness; of echocardiogram results indicating some abnormal functioning of his heart, consistent with high blood pressure; and of an MRI study revealing thickening of the carotid artery, which would present the risk of stroke. In addition to testifying to the risk of stroke with carotid stenosis, Dr. Snell stated that untreated high blood pressure would shorten the life span, but that proper treatment would probably shorten the span only slightly. The composite of the medical records were then entered into evidence, over the renewed objections of plaintiff's counsel. On redirect, plaintiff's counsel asked if Dr. Snell could testify to a reasonable degree of medical certainty how many years Mr. Jones's diabetes, high blood pressure, and carotid stenosis would shorten his life. Dr. Snell answered in the negative.

-6-

There is no question that Mr. Jones's medical records were relevant to the issue of life expectancy, which in turn bears on the damages calculation. It appears from their argument on appeal that Ms. Jones and Ms. Hall take issue with the admission of the records through the testimony of Dr. Snell more so than with the admission of the records themselves.

The sole grounds upon which Ms. Jones and Ms. Hall challenge this evidence are, first, that Dr. Snell was unqualified to testify as to the effect of these conditions on Mr. Jones's life expectancy, and, second, that Dr. Snell did not meet the standard of testifying to a reasonable degree of medical certainty. Tennessee Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. Ms. Jones and Ms. Hall called Dr. Snell to the stand as their medical expert. We must presume, absent any evidence otherwise, that Ms. Jones and Ms. Hall considered Dr. Snell to be qualified to render an expert opinion on the injuries and cause of death. We thus understand the plaintiffs' argument to be that, as a forensic pathologist, Dr. Snell was not qualified to address how diabetes, high blood pressure, and carotid stenosis would affect one's life expectancy. We must disagree. We find Dr. Snell's training as a medical doctor and a general pathologist qualified him to opine on the diseases' general effects on life expectancy. Dr. Snell's training and board certification in pathology indicate he is knowledgeable about the effect of disease processes on the body.

Ms. Jones and Ms. Hall contend that Dr. Snell's testimony regarding life expectancy was inadmissible because he could not testify to a "reasonable degree of medical certainty" as to the effect of Mr. Jones's conditions on his life expectancy. Fullen Dock, on the other hand, asserts that the authority cited for this standard pertains only to issues of causation or the permanency of injury, elements for which the plaintiff bears the burden of proof.[5] Fullen Dock further argues that this standard does not apply to expert testimony offered by the defendant on the issue of life expectancy for the purpose of establishing damages for wrongful death.

Uncertainty as to the fact of damage or injury, or the fact of causation, for that matter, can be fatal to a plaintiff's claim. Once the case for negligence has been made by the plaintiff, uncertainty as to the amount of damages will not preclude recovery. *See* 22 Am.Jur.2d *Damages* § 332 (2006). Indeed,

> in tort cases the proof need not establish the amount of damages with
> mathematical precision, as long as the proof is as certain as the nature of the case

---

[5]Ms. Jones and Ms. Hall cited, among others, *Jackson v. Allen*, No. M2000-01673-COA-R3-CV, 2002 WL 661930 (Tenn. Ct. App. Apr. 23, 2002)(*no perm. app. filed*), *McKinley v. Simha*, No. W2001-02647-COA-R3-CV, 2002 WL 31895715 (Tenn. Ct. App. Dec. 31, 2002)(*no perm. app. filed*), and *Porter v. Green*, 745 S.W.2d 874 (Tenn. Ct. App. 1987), all of which are personal injury cases involving evidence proffered by the plaintiffs to prove causation, permanency of injury, or both.

permits, and it enables the jury to make a fair and reasonable assessment of the damages. Thus, while damages should not be awarded when the existence of damage is uncertain, they may be awarded if the existence of damage is certain, but the extent of damage is not.

*Keith v. Murfreesboro Livestock Mkt., Inc*., 780 S.W.2d 751, 755 (Tenn. Ct. App. 1989)(citations omitted).

We believe the plaintiffs' life expectancy tables and jury instructions illustrate this point. Ms. Jones and Ms. Hall submitted life expectancy tables to the jury, which was later instructed according to Tennessee Pattern Jury Instructions, as follows:

The life expectancy read to you is not conclusive, but it's an average life expectancy of persons who have reached a certain age. Be aware that many persons live longer, and many die sooner, than the average. This figure may be considered by you in connection with other evidence relating to the probable life expectancy of the deceased, including evidence of the deceased['s] health, occupation, habits and other activities.

Life expectancy predictions are anything but certain, but the tables still offer a means by which a jury might calculate reasonable wrongful death damages. We must disagree with Ms. Jones's and Ms. Hall's argument that the admissibility of Dr. Snell's testimony depended upon his ability to testify "to a reasonable degree of medical certainty" as to the particular effect of Mr. Jones's conditions on his life expectancy. Dr. Snell would not, and could not, provide this information. To require him to testify thus to any degree of certainty would be absurd. Indeed, one would be hard pressed to locate a medical expert qualified to predict when and how the decedent would have otherwise died.

In this case, although we decline to hold that Dr. Snell must have testified to a reasonable degree of medical certainty as to the specific effect of the decedent's health conditions on his life expectancy, we do emphasize that the "degree of certainty" standard illustrates the requirements of Tennessee Rule of Evidence 702, which applies to all expert opinion testimony, including that of Dr. Snell. To be admissible, expert opinion testimony must "substantially assist the trier of fact." Tenn. R. Evid. 702. Speculative testimony from an expert witness cannot substantially assist the jury. Thus, we must consider whether Dr. Snell's testimony was so speculative that it failed to meet the requirements of Rule 702.

As an initial matter, we find that Ms. Jones and Ms. Hall slightly misconstrue the nature of Dr. Snell's testimony on this issue. On cross-examination, counsel never asked Dr. Snell how

Mr. Jones's health conditions would have affected his life span.  Rather, Dr. Snell answered questions as to the general effect of an identified condition on a person's life expectancy.  Indeed, the plaintiffs do not appear to dispute the propositions that diabetes, high blood pressure, and carotid stenosis shorten life expectancy as explained by Dr. Snell.   Neither do they appear to challenge Dr. Snell's statements that the effects may vary, particularly with diabetes and high blood pressure, according to whether the conditions are treated.  In order to "substantially assist the trier of fact," Dr. Snell was not required to testify to the effect on Mr. Jones's life expectancy. The information communicated by Dr. Snell on cross-examination was beyond the ken of the jury's common knowledge and  provided a means by which the jury could weigh the evidence of Mr. Jones's state of health alongside the information in the life expectancy charts.

We find no error in the trial court's admission of evidence relating to Mr. Jones's prior medical history. Information pertaining to Mr. Jones's prior medical history was competent evidence of his health, which, per the jury instructions, related to his probable life expectancy. Even if we were to find error here, as addressed below, this error would be harmless.

Ms. Jones and Ms. Hall contend that this alleged evidentiary error had a prejudicial effect in two ways. First, they contend the admission invited the jury to speculate improperly as to Mr. Jones's life expectancy.   Our review of the record indicates that Ms. Hall's testimony and the application for disability benefits she submitted on behalf of Mr. Jones prior to his death communicated virtually the same information.   Ms. Hall completed a Social Security Disability request form for Mr. Jones on March 5, 2000.  The information she provided on the form indicated that Mr. Jones's health kept him from working; that he sat around most of the time and suffered from anxiety and depression (taking Prozac for it); that he felt bad most of the time; that he got dizzy frequently, felt sluggish, and had headaches; that he was forgetful and could not finish tasks already started or remember to take his medicine; and that he had been fired from his jobs as a result of his health.  And while testifying, Ms. Hall confirmed that Mr. Jones took insulin by injection, high blood pressure medication, and Prozac.  Ms. Halls' testimony confirmed that Mr. Jones had diabetes and high blood pressure at a minimum, and the Social Security Disability form, admissible substantively as a Party-Opponent admission under Tennessee Rule of  Evidence 803 (1.2), painted a dim picture of Mr. Jones's health prior to the accident.  Were  we to find error in the trial court's admission of evidence through Dr. Snell, which we do not, that error would be harmless in light of this independent evidence.

Second, Ms. Jones and Ms. Hall also assert that this admission invited the jury to speculate as to whether Mr. Jones blacked out just prior to the incident, an allegation they contend affected the jury's allocation of fault by bearing on the issue of causation.  We recognize that the trial judge admitted the evidence in part as circumstantial evidence of Mr. Jones's

passing out on the day of the incident.[6] We also acknowledge that the cross-examination of Dr. Snell left open, by implication only, the possibility for Fullen Dock to make a causation argument. For example, counsel for Fullen Dock inquired into whether an autopsy had been conducted on Mr. Jones (it had not) and whether an autopsy would have revealed information pertaining to Mr. Jones's internal organs such as his heart, his carotid artery, and the like (it would have). Beyond this suggestion, however, we can find no evidence of Fullen Dock's advancement of this causation argument. Fullen Dock's closing argument did not address the possibility of Mr. Jones passing out that day. Instead, it focused on Mr. Jones's level of fault in failing to wear the orange safety vest and insuring that the bulldozer driver saw him before doing anything else in the vicinity. Accordingly, we find this argument unpersuasive.

### *Admission of Evidence Relating to Mr. Jones's Prior Drug Conviction*

Approximately fifty-three (53) trial transcript pages are devoted to two bench conferences, also held outside the hearing of the jury, pertaining to the admissibility of Mr. Jones's prior conviction for possession of cocaine. The first bench conference involved defense counsel's ability to raise the conviction during the cross-examination of Ms. Hall, who had admitted in her deposition to knowing he had been arrested in Tennessee for possession of cocaine. At various times during the bench conference, the trial judge identified different bases for admitting the evidence of conviction, but ultimately held the ruling in abeyance until the testimony of Ms. Jones, who also knew of the conviction. Defense counsel made an offer of proof with respect to Ms. Hall's testimony, but Ms. Hall never testified to any of this information before the jury.

At the second bench conference, counsel for Ms. Jones and Ms. Hall argued that application of the Rule 403 balancing test[7] required the exclusion of the evidence, as the probative value was so low and risk of unfair prejudice so high. Counsel then identified, according to him, the only two possible theories of relevance: first, the impact of cocaine use on Mr. Jones's life expectancy, and, second, the impact of a conviction on Mr. Jones's employment prospects. Arguing that a one-time drug conviction was not proof of habitual use and that no expert testimony had been offered regarding its effect on life expectancy, counsel for Ms. Jones and Ms. Hall concluded it should be excluded. Counsel then added that, although the conviction might have been relevant to issues of employment, no proof had been offered regarding Mr. Jones's ability to get a job, and, furthermore, the plaintiffs were not "making a claim for lost wages."

---

[6]The exchange between counsel and the trial judge as to the admissibility of this evidence occurred outside the hearing of the jury.

[7]The Tennessee Rules of Evidence provide that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of, among other pitfalls, unfair prejudice. Tenn. R. Evid. 403.

Defense counsel cited *Hensley v. Harbin*, 782 S.W.2d 480 (Tenn. Ct. App. 1989), as authority for the proposition that evidence of the deceased's conviction of a crime reflects upon his character and ability to earn an honest livelihood. The court agreed with this proposition and allowed evidence of the conviction to be introduced through Ms. Jones.[8] At trial, the jury ultimately heard the following testimony from Ms. Jones on direct examination conduction by her counsel:

Q: Well, did he get into some trouble with the law when he moved down [to Tennessee]?

A: Yes.

Q: All right. Tell us about that?

A: Well, I got a telephone call and he told me he was in jail, but he didn't never tell me what he was in jail for, and he told me he was sorry, that he made a mistake.

Q: When did he call you and told (sic) you that he was in jail?

A: '94.

Q: And at the time did you know what it was for?

A: No.

Q: Since that time have you come to understand what it was for?

A: I found out when I was in court. He didn't never tell me.

Q: What did you come to find out he was charged with?

A: He was charged with possession of cocaine.

Q: Do you know if he was convicted or if he pled guilty to that charge?

A: He told me he pled guilty.

. . . .

Q: Do you know how long he was in jail?

A: To my knowledge a year.

Q: Do you know why he got out?

A: For good conduct.

. . . .

---

[8]During the bench conference, the trial judge strongly suggested that the opponent of the conviction evidence introduce it during direct examination. Thus, Ms. Jones and Ms. Hall, in spite of their objections to the evidence, were the first to introduce it at trial and now, on appeal, challenge the admission. Even though they were the first to introduce this information, we will address their objections to the admission of evidence in light of the trial judge's direction.

Q:    What did you think about the fact that he had gone to jail?

. . . .

A:    I was hurt, but I forgave him because he always would tell me he was
      sorry, he made a mistake, and when he'd get out he said he wouldn't go
      again and he would do better.


On cross-examination, Ms. Jones testified as follows:


Q:    And then with regard to the cocaine conviction he was charged with
      selling cocaine or possessing cocaine?

A:    I don't know what he was charged with because he didn't never tell me.

Q:    All right.  But he spent a year in prison as a result of that, whatever it was,
      involving the cocaine, correct?

A:    Yes.


Aside from these exchanges, there is no evidence in the record of Mr. Jones's connection with illegal drugs or with the commission of crime.


On appeal, Ms. Jones and Ms. Hall renew their contention that the application of the Rule 403 balancing test should have resulted in the exclusion of this evidence.  The primary prejudice they cite is the resulting implication that Mr. Jones "had a habit of not following the rules."  To illustrate this prejudice, Ms. Hall and Ms. Jones note that the trial judge, during a bench conference, made the observation that the conviction was relevant to Mr. Jones's conduct with respect to rules and to his own safety.  They further insist that these inferences, drawn from the fact of his conviction some six or seven years prior to the accident, constituted an unwarranted leap of logic.  They contend that the admission of this evidence allowed the jury to draw the same inferences as the trial judge, thus bearing on the issue of Mr. Jones's fault on the day in question.  Moreover, Ms. Jones and Ms. Hall argue that the general prejudicial effect of the admission diverted the jury's focus and cast Mr. Jones in an unfavorable light.  They point to the one hundred thousand dollar ($100,000) award as evidence of this effect.


Fullen Dock, on the other hand, argues that the admission of the conviction evidence was proper for several reasons.  First, it argues that the proper application of the ten year time limit of Rule 609 does not result in the exclusion of the evidence.  Second, it argues that because Ms. Hall testified that Mr. Jones was a nice person and that she disavowed her previous deposition testimony as to his arrest for cocaine, both her credibility and his character were placed at issue.  Third, Fullen Dock argues that evidence of the conviction is relevant to the pecuniary value of

Mr. Jones's life, as gauged by his personal habits regarding sobriety and industry as well as his capacity to earn money.

We will first dispose of the unpersuasive arguments lodged by each party. First, we agree with Ms. Jones and Ms. Hall that the "rule breaker" conclusion would require a leap of logic. Yet, it would involve such a leap of logic that, in the absence of any evidence suggesting the jury made this leap, we find the likelihood of its occurrence to be highly improbable. Fullen Dock never cast Mr. Jones as a rulebreaker and certainly never implied such in connection with his cocaine conviction. In sum, we can find no evidence to support this allegation.

We also find no merit in Fullen Dock's first contention with respect to Rule 609. Tennessee Rule of Evidence 609 sets forth the parameters within which one may impeach a witness by admitting evidence of his or her prior conviction of a crime. *See* Tenn. R. Evid. 609. Counsel for both parties—as well as the trial court—debated at length about how Rule 609 (specifically, the time limit provision in section (b)) should be applied to Mr. Jones's conviction for cocaine possession. Notwithstanding this adversarial zeal, the plain language of Rule 609 itself indicates that the rule does not apply here in any fashion. "For the purpose of attacking the credibility of a witness, *evidence that the **witness** has been convicted of a crime* may be admitted . . . ." Tenn. R. Evid. 609 (a)(emphasis added). If Ms. Hall or Ms. Jones had been previously convicted of a crime, the application of Rule 609 would determine whether or not counsel could employ evidence of that conviction to challenge her credibility. But the case here involves evidence of the decedent's prior conviction – not of the witness's. More importantly, the evidence of conviction was never offered through Ms. Hall but was instead offered by plaintiff's counsel[9] through Ms. Jones on direct.

We find Fullen Dock's second argument regarding Ms. Hall's testimony to be equally unpersuasive. First, as we noted above, Fullen Dock made an offer of proof by cross-examining Ms. Hall on the issue of the conviction. At that time, Ms. Hall denied having any knowledge pertaining to the cocaine conviction. Fullen contends the admission of Ms. Hall's inconsistent deposition testimony would have impeached her credibility. Even though the trial court eventually ruled in favor of Fullen Dock on the admissibility issue, Ms. Hall never disavowed her knowledge in front of the jury; thus, there was no conviction testimony to impeach. Fullen Dock cannot now support the admission of the conviction evidence through Ms. Jones by arguing that it could have impeached testimony never presented to the jury.

Likewise, although Fullen Dock sought to impeach Ms. Hall's testimony at trial that Mr. Jones was a "nice guy" by inquiring into her level of knowledge about the conviction, it never

---

[9]As we noted above, the trial court's strong suggestion that counsel for Ms. Jones and Ms. Hall offer the evidence of conviction on direct examination does not obviate the need for our analysis.

did so in front of the jury. When the trial judge held her ruling in abeyance at the time of Ms. Hall's testimony, counsel for Ms. Jones and Ms. Hall offered to call Ms. Hall again, after the delayed ruling, if needed. Nothing in the record suggests that Fullen Dock attempted, or even wanted, to cross-examine Ms. Hall at a later date. Because we ultimately find no abuse of discretion in the admission of the evidence as actually presented to the jury, we need not consider this alternative theory involving a cross-examination that Fullen Dock never conducted or even subsequently pursued.

Further, Ms. Hall's testimony regarding Mr. Jones's nice character, family involvements, and devotion to his loved ones did not "open the door" for the admission of prior convictions through the testimony of Ms. Jones. Tennessee Rule of Evidence 404 provides that "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity with the character trait on a particular occasion." Tenn. R. Evid. 404. Subsection (a) then sets out the only exception to this rule, which allows the prosecution to introduce certain types of character evidence when a defendant "opens the door" by introducing evidence of his or her character, if pertinent. *See* Tenn. R. Evid. 404(a)(1). The Tennessee Rules of Evidence extend this exception to the general ban on character evidence only in criminal cases. *See id.*; Neil P. Cohen, Sarah Y. Sheppeard & Donald F. Paine, *Tennessee Law of Evidence* § 4.04 [3], at 4-77 (5th ed. 2005). The Rules restrict the use of character evidence in civil cases even more severely by rendering it inadmissible[10] as circumstantial proof in all civil actions. *See* Tenn. R. Evid. 404(a) advisory comm'n cmt. (noting that Rule 404(a) rendered "character evidence . . . inadmissible circumstantially in all civil cases" by changing Tennessee's minority approach allowing character evidence as circumstantial proof of moral turpitude). The "opening the door" concept does not apply here. Even more, we do not perceive the conviction evidence as having been offered to prove that Mr. Jones acted in similar fashion on a particular occasion, thus bringing it outside the scope of Rule 404(a).

Ms. Jones's and Ms. Hall's more general Rule 403 argument and Fullen Dock's third argument, however, do require more in-depth consideration. Although the Tennessee Rules of Evidence generally ban admission of character evidence offered to prove action in conformity with the character trait, they do allow for the admission of the same type of evidence offered for different purposes. Rule 404(b) sets forth the procedure by which a *criminal* trial court may admit character evidence offered for other purposes. *See* Tenn. R. Evid. 404(b), 2005 advisory comm'n cmt. ("The word 'person' in Rule 404(b) has been construed to refer solely to the defendant in a criminal prosecution."). It requires the proponent of the evidence to satisfy a

---

[10]Rules 608 and 609 govern the admission of similar evidence for the limited purpose of impeaching the credibility of a witness in civil actions. *See* Tenn. Rules of Evidence 608 & 609.

-14-

balancing test more rigorous[11] than that set out in Rule 403. But, as part of a civil case[12], this issue requires the application of Rules 401 and 403, which allow for the exclusion of relevant evidence if its "probative value is *substantially outweighed* by the danger of unfair prejudice." Tenn. R. Evid. 403 (emphasis added).

Fullen Dock advances the argument that evidence of Mr. Jones's conviction was relevant to damages, specifically to the pecuniary value of his life. A factor for the jury to consider in establishing the pecuniary value of the decedent's life is his or her "personal habits . . . as to sobriety and industry." *Jordan v. Baptist Three Rivers Hosp.*, 984 S.W.2d 593, 600 (Tenn. 1999). Additionally, the fact finder should consider the decedent's capacity for earning money. *Id.* Fullen Dock also cites *Hensley v. Harbin*, 782 S.W.2d 480 (Tenn. Ct. App. 1989), as authority for the proposition that evidence of the decedent's commission of a crime is competent on the issue of the pecuniary value of the decedent's life. This Court remanded that case back to the trial court because of an erroneous exclusion of evidence pertaining to the decedent's commission of a crime one month before his death. *Hensley*, 782 S.W.2d at 481. Determining that evidence of the decedent's burglarizing a vehicle was relevant to his inclination to earn an honest living, we stated that:

> [c]ertainly the commission of a crime places one's future in jeopardy and if convicted could render one's ability to support his family completely ineffectual. In our opinion, the evidence of a commission of a crime is competent on the question of the pecuniary value of the life of the deceased, and the court erred in excluding such testimony in this case.

*Id.* Unfortunately, several factors in the case at bar complicate the analysis. The probative value of Mr. Jones's conviction is somewhat diminished for two reasons: first, the conviction occurred approximately six years[13] before his death, as compared to the one month lapse in *Hensley*, and second, Ms. Jones and Ms. Hall had not offered proof of Mr. Jones's capacity to earn money and, apparently, did not seek to recover any income he might have earned in the future. Moreover, there was no suggestion or open allegation that Mr. Jones was a drug user. Indeed, Dr. Snell confirmed that Mr. Jones's post mortem toxicology tests were negative for drugs and alcohol.

---

[11]The trial court must exclude the evidence if its "probative value is outweighed by the danger of unfair prejudice." Tenn. R. Evid. 404(b)(4).

[12]"[P]roof of such acts of people other than the criminal accused or of people in a civil case are to be assessed under the more liberal standards of Rule 401 rather than Rule 404(b)." Neil P. Cohen, Sarah Y. Sheppeard & Donald F. Paine, *Tennessee Law of Evidence* § 4.04 [7][a], at 4-86 (5th ed. 2005).

[13]Even though Rule 609 does not apply here, the age of the conviction still bears on its relevance and probative value.

-15-

On appeal, this Court is not called to reapply the balancing test of Rule 403; rather, we must determine whether the trial judge abused her discretion when she admitted evidence of Mr. Jones's prior conviction. In spite of the diminished probative value of this evidence, we decline to find error here because Ms. Jones's and Ms. Hall's complaint demanded damages for, among other things, the pecuniary value of Mr. Jones's life as well as lost income and loss of earning capacity. We cannot say that, in light of the *Hensley* case and of the contents of the complaint, the trial judge abused her discretion.

Additionally, even if we were to find an abuse of discretion, we would be unable to find prejudice - - and therefore reversible error - - in this case. The sole basis for recovery in this case was Ms. Jones's loss of parental consortium, and we do not believe that the exclusion of this evidence would have more probably than not changed the jury's award in this case. Even more, loss of consortium damages would have necessarily depended on the jury's credibility determination with respect to Ms. Jones. Her brief statements about the conviction did not appear to diminish the effect of her testimony as to the intangible loss she sustained from her father's death.

For foregoing reasons, we affirm the judgment of the trial court. Costs of this appeal are taxed to Ms. Theresa Diane Jones, Ms. Johnnie Mae Hall, and their sureties, for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE

-16-